# United States District Court
## Northern District of Alabama
### Southern Division

FILED

00 JUL 28 AM II: 35

U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED

JUL 2 8 2000

Randy Prince, et al.,                          ]
                                               ]
    Plaintiff(s),              ]
                                               ]
    vs.                        ]      CV-98-N-187-S
                                               ]
Shaner Hotel Group d/b/a Holiday               ]
Inn Airport,                                   ]
                                               ]
    Defendant(s).              ]

### Memorandum of Opinion

## I.    Introduction.

In this action plaintiffs **Ronnie Parker**, ("Parker"), **Adrian Stephenson**, ("Stephenson"), and **Johnny Lavender** ("Lavender") allege that they were subjected to numerous violations of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, while employed by the defendant Shaner Hotel Group ("Shaner"). The matter is presently before the court on Shaner's motions for summary judgment (Docket Nos. 55, 68, 72). The issues have been briefed by both parties and are now ripe for decision. Upon due consideration, the motions will be **granted** in all respects.

**E-FILE**

165

## II.    Statement of Facts.[1]

For summary judgment purposes, as it is required to do, the court will view the evidence in a light most favorable to the plaintiffs and all reasonable inferences are drawn in their favor. Unless otherwise noted, the "facts" come from the plaintiffs' deposition testimony.

### A.    Ronnie Parker.

Plaintiff Parker worked at the Holiday Inn-Airport hotel as a full-time banquet worker between January and March of 1997, at a time when it was owned by another company. In May of 1997, defendant Shaner Hotel Group acquired the hotel and named Ed Cicinato ("Cicinato") as the general manager. Plaintiff Parker returned to the hotel as a part-time on-call banquet worker in July. He contends that while employed by Shaner, he was subjected to racially hostile comments. He also contends that because of his race he was treated differently than were persons who were not of his race and that Shaner retaliated against him and then wrongfully terminated him.

The plaintiff cites several instances where he allegedly was subjected to a racially hostile environment. For example, in May of 1997, after questioning Shaner officials about tip money, Parker heard Cicinato remark "them niggers ought to be happy – they ought to be happy about the money they got now, because they done made more money than they ever made." The plaintiff recounted another incident which occurred in May of 1997,

---

[1]In developing the statement of facts in this opinion, the court considered those facts claimed to be undisputed by the parties, the parties' respective responses to those claims, and the court's own examination of the evidentiary record. These are "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1984), *cert denied, USX Corp. v. Cox*, 114 S. Ct. 900 (1995).

wherein he heard Cicinato and Sonja Waters discussing another employee, Marva Lewis. According to Parker, Cicinato instructed Waters to "watch that nigger." Additionally, Parker claims that in November of 1997, he heard Food and Beverage Director Wil Tester remark that "them niggers can't never get nothing done on time. What is wrong with them niggers over there." The plaintiff generally asserts that Tester often said things like "niggers, them damn fools" to white employees. Lastly, the plaintiff states that Shaner official Rick Voelzke would ignore him, but speak to similarly situated white employees.

The plaintiff also complains that he was paid less than were white dining room workers. In particular, he alleges that Shaner controlled the tips so that white workers received more than black workers. Parker states that he complained to Tester about the situation but did not pursue the matter further. Additionally, the plaintiff contends that in approximately September of 1997, white workers were brought from the dining room to work in the banquet area, therefore depriving him of tip money. Again, the only complaint Parker made about the situation was to Tester.

In August or September of 1997, Parker was taken off the banquet work schedule by Sonja Waters and Wil Tester. According to a written warning that was signed by Tester, Waters, and Parker, the plaintiff, upon learning of the decision, displayed a temper, was insubordinate, and engaged in threatening behavior. (Def. Ex. 51). The plaintiff did not think the removal decision was fair and decided to call Peter Hulbert ("Hulbert") at the Shaner corporate office. In response to the call, Hulbert set up a meeting between the plaintiff and Tester. At the meeting, the general manager of the hotel instructed Waters and Tester to put the plaintiff back on the schedule. Approximately two weeks later, the plaintiff was placed

3

back on the schedule and returned to work at the Holiday Inn.[2] Parker agreed the incident had been resolved in a manner that was satisfactory to him.

Parker maintains that he was laid off on December 20, 1997. However, his personnel file contains a written warning notice signed by Terry McDowell stating that on January 21, 1998, Parker did not appear for work after being called to a banquet function. (Def. Ex. 53). A separation notice, dated January 30, 1998, states that Parker was terminated as a result of not returning from "slack time" when called in to work. (Def. Ex. 54).

**B.    Johnny Lavender.**

Johnny Lavender, is a black male who, in June of 1997, was hired by Shaner Hotel to work at the Holiday Inn-Airport. He was hired as a general maintenance engineer whose job entailed doing "a little bit of everything." Mr. Lavender was employed with the hotel until his termination in January of 1998. The plaintiff contends that while working for Shaner he was subjected to a racially hostile environment, suffered disparate treatment, was wrongfully discharged, and was retaliated against for filing an EEOC charge.

In August of 1997, the hotel hired Marvin Hancock (white) to work in the hotel's Maintenance/Engineering department. According to the plaintiff, Hancock was paid more than he was, despite the fact that they worked in the same department, and that he was responsible for "training" Hancock. Furthermore, the plaintiff contends that he and other black employees worked weekends and holidays, unlike Hancock. Also, Lavender

---

[2] Although the plaintiff states that the matter was handled to his satisfaction, the plaintiff did complain about the length of time (two weeks) in which it took Tester and Waters to place him back on the schedule. However, the plaintiff also testified that during this two week period there were no banquets scheduled at the hotel (Parker Depo. p. 65).

maintains that unlike himself, Hancock received a pay raise within the first three months of his employment. Upon complaining to management about not receiving a comparable raise, the situation was resolved when general manager Cicinato called the corporate office and put a "rush" on the plaintiff's pay raise.

Lavender alleges that he was first subjected to a racially hostile work environment in September of 1997. According to Lavender, he and two other hotel employees were working on a defective fire alarm system when Cicinato shouted at them "turn that damn alarm off, I'm losing business, can't you niggers get that shit fixed?" In response to this incident and the way in which Cicinato treated guests,[3] Lavender claims that he called Shaner's 1-800-number three times in September of 1997, once in October, and once in January of 1998 to talk to Tom Pugh, a Shaner employee listed in the employee manual. However, Shaner responds that the phone records from the hotel show no calls to the 1-800-help line or to other corporate office numbers were made from the extensions in which Lavender claims he placed the calls. The plaintiff also complained of an incident in which a member of management, Rick Voelkze, threatened black and white maintenance employees that if the hotel did not pass inspection they would all be fired.

In December of 1997, Lavender was disciplined for making pass keys without authorization. (Def. Ex. 23). Thereafter, on January 3, 1998, Wackenhut Security Officer T.W. McCluskey filed an incident report with the Holiday Inn-Airport management stating that he had observed Lavender on hotel property with a female at approximately 2:30 a.m. (Def. Ex.

---

[3] Lavender claims he heard a conversation between Cicinato and white guests in which he heard "a lot of cursing." (Lavender Depo. p. 98). However, the plaintiff further states that beyond the use of profanity, he did not know the general nature of this conversation.

43). Lavender denies McCluskey's account and states that on the night of the reported incident he was staying at the Bama Hotel located in Birmingham. Lavender was terminated on January 5, 1998. (Def. Ex. 45).

### C.   Adrian Stephenson.

Ms. Stephenson began working at the Holiday Inn in January of 1996 as a dining room and banquet server. Relevant events concerning her claims began when Shaner acquired the hotel property in May of 1997, when Cicinato was named general manager of the facility. The plaintiff alleges that after Cicinato took over, she and other hotel employees were subjected to racially disparaging remarks. Additionally, Stephenson contends that during this period she was retaliated against for making complaints concerning discriminatory practices, paid less than male employees, and constructively discharged.

In July of 1997, Cicinato called a meeting of food servers after a guest complained about the identity of the server who had served her juice. According to Stephenson, at the meeting she asked Cicinato what difference it made who served the juice, as long as the guest received it. In response, Cicinato called the plaintiff a "smart ass," told her to shut her "damn mouth," and commented that she was "just a stupid nigger." Stephenson also alleged that she could sometimes hear Cicinato shout "them stupid niggers" in his office with the door open. According to the plaintiff, this happened "a couple of times."

The plaintiff also tells of instances when, outside her presence, Cicinato made racially derogatory comments about her. For instance, the kitchen supervisor told Stephenson of a department heads meeting in which Cicinato had referred to her as a "long haired black nigger." Arthur Flowers, Banquet Manager, attested that at a weekly meeting

6

he heard Cicinato refer to Stephenson as "nappy ass haired son of a bitch." (Flowers Aff. ¶ 5). Lastly, Paul James, Assistant Chief Engineer, recounted a meeting in which Cicinato stated, in reference to the plaintiff, "the black dreadlock-wearing bitch, she doesn't need to be serving white guests." (James Depo. p. 12).

Stephenson also presents various other examples of inappropriate conduct while she was employed by Shaner. For example, she claims that Cicinato was abusive to her and other hotel employees after he learned that they had served spoiled milk. In fact, after the milk incident, she called the corporate office to complain. Stephenson also maintains that Johanna Gregg, head of the sales department, complained to Cicinato on numerous occasions regarding Stephenson's job performance, and in a separate incident, mockingly questioned the plaintiff as to whether she had paid for her lunch.

In addition to the foregoing, the plaintiff also maintains that black employees had lesser dining privileges than did their white counterparts. According to Stephenson, Cicinato ordered the black employees to eat in the break room, located between the men and women's restrooms while white employees, such as Lura Cost, were allowed to eat in the main dining room and the bar.

Stephenson's final complaint concerns her transfer to the housekeeping department. According to her, upon learning of the transfer, she and Marva Lewis went to Cicinato to complain about the change and his behavior in general. Stephenson asserts that she told Cicinato that she would quit if she had to work in housekeeping. In response, Cicinato allegedly stated that he knew that Stephenson had called the corporate office. Moreover, he responded, "well, my job is secure. I'm not threatened. My mafia family will take care

7

of that for me." After this incident, Stephenson again called the corporate office to lodge a complaint.

By the end of July of 1997, the plaintiff was no longer employed by Shaner. She contends that after Cicinato called her a "stupid nigger" she was afraid to return to work, and eventually quit. In contrast, the defendant has presented evidence that Stephenson was fired. According to a "record of verbal warning," Stephenson received a verbal warning on July 23, 1997, stating that she was terminated immediately because her performance was unsatisfactory and that she had a lack of ability and failed to abide by Shaner Hotel Group rules to fulfill the requirements of her job. (Def. Ex. 55). Additionally, Food and Beverage Director Massoud Zandi ("Zandi") recalls that the plaintiff was fired as the result of several guest complaints. (Zandi Depo. pp. 38-39).

## III. Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movants can meet this burden by presenting evidence showing that there is no dispute of

8

material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Celotex*, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard

9

necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52; *see also Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 745 n.11(1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

.

**IV.    Discussion.**

   **A.    Hostile Environment Racial Discrimination.**

      **1.    Abusive and Hostile Atmosphere.**

In order to establish a hostile environment claim, the employee must demonstrate (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome racial harassment; (3) that the harassment was based on the race of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable. *See Mendoza v. Borden,* 195 F.3d 1238, 1246 (11th Cir. 1999). In order to ensure that Title VII does not become a mere "general civility code," the fourth element requires the plaintiff to not only establish that he subjectively perceived the environment as hostile and abusive, but also that a reasonable person would perceive the environment to be hostile and abusive. *See id.*

When the complained of statements are of a racial nature, there are four factors the court must consider in determining whether they are sufficiently severe or pervasive from an objective standpoint to alter the employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Id.; Gupta v. Florida Board of Regents, et al.,* 212 F.3d 571, 584 (11th Cir. 2000). Although all of these considerations should be taken into account, no single factor is required. *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 23 (1993)*; Edwards v. Wallace Community College*, 49 F.3d 1517,

1521-22 (11th Cir. 1995). Whether conduct is severe and pervasive is determined by the totality of the circumstances. *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

In *Walker v. Ford Motor Co.*, 684 F.2d 1355 (11th Cir. 1982), the Eleventh Circuit rejected a contention that racial slurs used in the workplace were not sufficiently pervasive to establish a hostile work environment. The court noted that:

> "an employer violates Title VII simply by creating or condoning an environment at the workplace which significantly and adversely affects (the psychological well-being of) an employee because of his race or ethnicity, regardless of any other tangible job detriment to the employee." Ford argues, however, that the racial slurs used by Northgate personnel were either common parlance of an automobile dealership (i.e., "nigger-rigged") or else were sporadic references and in most instances not aimed at Walker. . . . Here, however, the district court specifically found that Northgate personnel's use of the terms "nigger-rigged" and "black-ass," as well as other racially abusive language was "repeated," "continuous," and "prolonged" despite Walker's objections, and that the language made Walker feel unwanted and uncomfortable in his surroundings.

*Id.* at 1358-59 (citations omitted). The court specifically stated that "[t]he fact that many of the epithets were not directed at Walker is not determinative. The offensive language often was used in Walker's presence after he had voiced objections to Ford. Accordingly, we find that under the circumstances Northgate's conduct 'creat(ed) a working environment heavily charged with ethnic or racial discrimination.'" *Id.* at 1359 (citations omitted).

Moreover, in *Busby v. City of Orlando*, 931 F.2d 764 (11th Cir. 1991), the same court again noted that:

> our circuit has held that '[t]he fact that many of the epithets were not directed at [the plaintiff] is not determinative' of whether a work atmosphere is polluted with racial discrimination. We recognize that the district court excluded the testimony because it felt that if Busby did not hear these slurs or if they were not directed toward her then she could not have experienced harassment as a result of them. Nevertheless, we hold that, in light of *Rogers*

12

and *Walker*, the district court abused its discretion in excluding such evidence.

*Id.* at 785 (citations omitted).

### a.    **Johnny Lavender.**

In the context of sexual harassment, two recent Eleventh Circuit cases have helped define what constitutes severe or pervasive harassment. In *Mendoza*, the court found the alleged harassing conduct to fall "well short" of the level of either severe or pervasive conduct sufficient to alter the plaintiff's terms or conditions of employment: (1) one instance where the supervisor said to plaintiff "I'm getting fired up"; (2) one occasion in which the supervisor rubbed his hip against the plaintiff's hip while touching her shoulder and smiling; (3) two instances in which the supervisor made a sniffing sound while looking at plaintiff's groin area and one instance of sniffing without looking at her groin; and (4) the supervisor's constant following and staring at Mendoza in a very obvious fashion. 195 F.3d at 1247.

Similarly, in *Gupta*, the plaintiff complained of sexually harassing conduct on the part of her supervisor, Rhodd. 212 F.3d at 584. The Eleventh Circuit found that conduct consisting of: (1) an occasion when Rhodd commented to Gupta that she was "looking very beautiful," (2) his frequent telephone calls to her at home, (3) an occasion when she entered Rhodd's office and found him wearing only an undershirt above the waist which he then tucked into his trousers, (4) staring at her, (5) touching her ring and bracelet once, (6) repeatedly asking her to lunch, and (7) one incident when Rhodd placed his hand on Gupta's knee, and another where he touched the hem of her dress did not amount to severe or pervasive harassment. *Id.* at 584-586.

13

An examination of the relevant factors demonstrates that Lavender did not endure conduct that was so severe or pervasive that it altered the terms or conditions of his employment. Two of the four factors - frequency of the alleged conduct and interference with job performance – are absent from the conduct described by Lavender. The other factors – severity and humiliating nature – are to some degree lacking, and more importantly, fail to compensate for the absence of the other two factors.

First, Lavender does not point to Cicinato or other Shaner officials' conduct which could be considered frequent. Beyond the one fire alarm incident, Lavender did not testify as to any other incident which could be considered harassing in nature. Lavender stated:

> Q.   (Ms. Singer) So you waited till December to talk to the EEOC about the racial slur that happened in September and about Rick (Voelkze) saying something about everybody being fired in the event that y'all didn't pass the inspection?
>
> A.   (Mr. Lavender) That's right.
>
> Q.   Was there anything else you told the EEOC?
>
> A.   I told them about Mr. Cicinato.
>
> Q.   What about him?
>
> A.   Making the racial slur.
>
> Q.   In September of –
>
> A.   By using the "N" word. It told them about that.
>
> Q.   And that occurred in September, correct?
>
> A.   That's right.
>
> Q.   Did it happen any time after September?

14

A.      Who, Mr. Cicinato?

Q.      Yes, sir.

A.      Not against me it didn't.

Q.      Okay. Did you hear him say it to anybody else, Mr. Lavender?

A.      No, I didn't.

(Lavender Depo. pp. 127-128). Moreover, he further testified that he had not experienced

racial remarks by any employee other than Cicinato. The only other related incident

concerns Lavender's testimony that other employees had gossiped about Cicinato's use

of racial slurs, including an incident where Cicinato allegedly made a racially disparaging

remark at a staff meeting about another Shaner employee. Construing the evidence in the

light most favorable to Lavender, the court is satisfied that Cicinato's conduct towards or

in the presence of Lavender is simply too infrequent to alter the conditions in which

Lavender was required to perform his job.

        In addition, there is not a question of fact as to whether the alleged conduct,

considered cumulatively, unreasonably interfered with Lavender's job performance. In

response to the defendant's argument, the plaintiff has failed to present any evidence which

might indicate that the quality of his work suffered or that he had a change in attitude that

affected his performance.

        The court must also consider whether Cicinato's conduct was severe and/or

humiliating in nature. There is no "black letter" definition for "severe." The court doubts,

however, that use of the word "nigger" by a white supervisor in the presence of or directed

to a black employee could ever be anything less than "severe."[4] Certainly, the evidence is sufficient to create a jury question as to whether a black employee in Lavender's position would be humiliated by such a remark, regardless of whether the slur was directed toward him on only one occasion. Unfortunately, Lavender presents very little evidence to demonstrate the degree or magnitude of the humiliation he might have suffered.

Despite the fact that some of the conduct might be considered severe and humiliating, there is not enough evidence to compensate for the absence of both the frequency and job interference factors. In particular, the court finds *Gupta* instructive. The court in *Gupta* recognized that a male supervisor placing his hand on an employee's knee once and touching the hem of her dress once, is serious and should not have been done. 212 F.3d at 585. Nevertheless, the court concluded "[b]ut those were only two incidents in a period of six or seven months during which they were interacting. . . . Each incident was only momentary, and neither was coupled with any verbal suggestions or advances." *Id.* Similar to the supervisor's touching in *Gupta*, the court recognizes that Cicinato's remark to Lavender concerning the fire alarm was severe in nature and clearly should not have been said. However, also like the conduct in *Gupta*, the statement was just one statement during a period of months and was not coupled with any physical or verbal threats.

The court is aware of its duty to examine and consider all of the alleged behavior and conduct of a race-related nature collectively in determining whether it meets the

---

[4]The word "now ranks as perhaps the most offensive and inflammatory racial slur in English. Its use by and among blacks is not always intended or taken as offensive, but . . . it is otherwise a word expressive of racial hatred and bigotry." Miriam-Webster Online Collegiate Dictionary.

"sufficiently severe or pervasive" standard. *Id.* at 586. The court has done so, and is satisfied it does not. Most importantly, as to Lavender, the record is void of any conduct which could be considered frequent or that caused an interference in his job performance. Also, there is very little evidence presented which indicates just how severe or humiliating Cicinato's statement was. Consequently, the court concludes that Cicinato's single statement to Lavender does not constitute sufficient evidence to create a genuine issue of fact as to his hostile work environment claim.

The court is compelled to point out that the plaintiff's hostile work environment argument centers primarily upon racially derogatory and humiliating remarks directed at other hotel employees. As noted above, however, the Eleventh Circuit has rejected the notion that racial slurs directed at others cannot form the basis for a worker's claim that the work place was "polluted with racial discrimination." *Busby v. City of Orlando*, 931 F.2d at 785.

The fact that epithets were not directed at Lavender is not determinative. Rather, the court must examine whether, under the circumstances, the conduct of Shaner's officials created a working environment heavily charged with ethnic or racial discrimination. *See Rogers* 454 F.2d at 238; *Walker v. Ford Motor Co.*, 684 F.2d at 1359 n.2; *Busby v. City of Orlando*, 931 F.2d at 785. However, in applying the rule, the experience of the individual plaintiff is not without import. For example, in *Busby*, the court held that in its hostile environment analysis, the district court improperly excluded testimony by a witness who claimed to have heard racial slurs referring to Busby.  931 F.2d at 785. Also, as pointed out in the footnote in *Walker*, even though it was not directed towards Walker, the offensive

17

language often was used in his presence after he had voiced objections to Ford.  684 F.2d at 1359 n.2. Finally, there is nothing in *Rogers*, which indicates that the plaintiff is somehow removed from, or immaterial to, the hostile environment analysis.

Here there is evidence other Shaner employees were subjected to a hostile environment. As such, a very broad reading of *Rogers* and its progeny might lead one to the conclusion that because of these other allegations, it is irrelevant as to what Lavender heard, saw, or perceived while working at the hotel. The court however does not believe that such an expansive reading is either necessary or appropriate. Rather, just as in *Walker* and *Rogers*, the proper examination is the effect a working environment alleged to be heavily charged with ethnic or racial discrimination had on the individual plaintiff at issue. Here, unlike *Busby*, Lavender has not indicated that employees, outside the plaintiff's presence, heard Shaner officials make racial slurs about him. Also, unlike *Walker*, there is no indication that the racial slurs continued after the fire alarm incident. The court simply can not ignore the plaintiff's own testimony that other than this one incident, he never heard Cicinato make another racial slur to him, or any other Shaner employee.

Also relevant to the analysis are the plaintiff's contentions that he had no other complaints about Shaner employees, that he had a good working relationship with Ron Meade, and that he has no complaints of harassment by Wil Tester. As for discussions among other Shaner employees, Lavender himself considered these to be workplace gossip. Lavender also admits that after the alarm incident, he complained to Cicinato about a raise, and Cicinato exercised unusual care to remedy the pay disparity between Lavender and Hancock.

18

Even giving the plaintiff every reasonable inference, his own testimony reveals that any atmosphere of racism or bigotry within the hotel did not affect him in such a way that a question of fact is created as to whether the terms or conditions of *his* employment were impermissibly altered.

After examining the totality of the circumstances, and not simply isolated acts, the court concludes that the conduct complained of by Lavender was neither sufficiently severe nor pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment. Certainly, Cicinato's comment was highly offensive. However, it does not change the fact that Lavender was subjected to such conduct, by his own admission, on only one occasion. "The complained of conduct must be persistent and routine rather than isolated or sporadic in nature in order to be sufficiently severe and pervasive to alter the conditions of employment." *Merriweather v. Alabama Dep't. of Public Safety*, 17 F. Supp .2d 1260, 1272 (M.D. Ala. 1998). Such is simply not the case as to Lavender. Moreover, the record is void of any evidence which indicates that the alleged conduct had any effect on the plaintiff's overall job conditions. Accordingly, based on the above case law and evidence submitted by the plaintiff, the court finds that Lavender has not created a genuine issue of material fact on the issue of whether the defendant's conduct was severe or pervasive to satisfy the requisite threshold.

### b.   Ronnie Parker & Adrian Stephenson.

Considering the evidence submitted in the light of controlling decisional law in this circuit, the court is satisfied that there exists a genuine issue of material fact on the question

19

of whether Ronnie Parker and Adrian Stephenson were subjected to a racially hostile work environment.

### 2.   Affirmative Defense.

An employer has available to it an affirmative defense providing it a "safe harbor from vicarious liability when the victimized employee suffered no adverse tangible employment action." *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1296 (11th Cir. 2000). The employer must demonstrate: (1) it exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) the employee unreasonably failed to take advantage of any preventive or corrective measures provided by the employer to prevent harassment. The defendant employer must establish both prongs in order to successfully interpose this defense.[5] *Id.* at 1297; *See Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1370 (11th Cir. 1999)(Barkett, J., concurring).

As to the first prong, the *Faragher* court held that "[w]hile proof that an employer has promulgated an anti-harassment policy with a complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense." 118 S. Ct. at 2279. It is undisputed that Shaner had a written harassment policy and grievance procedure set forth in the employee handbook. The manual simply states: "If you feel that you have experienced harassment, report the incident immediately

_____

[5] The affirmative defense is not available when the supervisor's alleged harassment culminated in tangible employment action taken against that employee. *See Faragher*, 118 S. Ct. at 2279. In the present matter, neither Parker nor Stephenson responded to Shaner's argument that any alleged harassment did not culminate in alleged adverse employment actions. After reviewing the record, the court considers that for summary judgment purposes, a question of fact does not exist as to whether the alleged harassment culminated in tangible employment action.

to the General Manager, the Vice President of Operations, the Insurance/Benefit Department, the Corporate Counsel or any officer of Shaner Hotel Group with whom you feel comfortable." Neither Parker nor Stephenson disagree with the defendant's contention that it exercised reasonable care to prevent and correct promptly any harassing behavior. Thus, as to both plaintiffs, the first prong of the *Faragher* defense is satisfied.

As to the second prong, the defendant maintains that both Parker and Stephenson unreasonably failed to follow Shaner's procedure. With respect to this prong, the Supreme Court has stated:

> And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Faragher*, 118 S. Ct. at 2293.

### a.    **Ronnie Parker.**

The defendant here points out that despite Parker's earlier success with calling the corporate office, he admits that he did not call anyone about the use of racial comments. The plaintiff responds with the non-specific argument that either he called Shaner to report the discriminatory conduct, or that because other employees' calls were unsuccessful, it was useless for him to call. Parker further notes that some of the plaintiffs complained to Food and Beverage Director Massoud Zandi, and that Shaner's corporate representative knew of no evidence which would contradict the testimony of each plaintiff that they

respectively called the home office to complain about the racially hostile environment at the hotel.

The court is a bit perplexed by this argument. First, it is undisputed that Parker did not report to Shaner officials the discriminatory conduct which allegedly created the hostile working environment. Moreover, his alternative argument that notice was not provided because of the lack of success on the part of other employees directly contradicts his own experience. Specifically, Parker testified that when he called the corporate office about being left off the schedule, his grievance was handled in a manner which satisfied his concerns. Similarly, the contention that some plaintiffs spoke with Zandi is inapplicable to Parker's case as he explicitly testified that he did not complain to Zandi about Cicinato, Tester, or Waters.

As the foregoing demonstrates, each of the reasons articulated by the plaintiff in response to the defendant's affirmative defense argument is in direct conflict with his own testimony. Accordingly, Shaner is entitled to summary judgment on the hostile work environment claim because there is no genuine issue of material fact from which a reasonable juror could infer that Parker's failure to take advantage of any preventive or corrective measures provided by Shaner to prevent harassment was reasonable.

Although it was not mentioned in his responsive brief, the court is compelled to address Parker's deposition testimony that he did not call the corporate office because he was afraid of Cicinato. Generally, a plaintiff cannot escape summary judgment by asserting the conclusory statement that he was frightened to call the corporate office.  To hold otherwise would essentially impose liability upon employers for failing to combat

harassment of which it was not aware. *See Fierro v. Saks Fifth Ave.,* 13 F. Supp. 2d 481, 492 (S.D. N.Y. 1998)("every employee who feels harassed by a supervisor will at some level fear the inevitable unpleasantness which will result from complaining to the employer. . . . However, to allow an employee to circumvent the reasonable complaint requirements of *Faragher* and *Burlington* by making conclusory allegations of feared repercussions, would effectively eviscerate an affirmative defense which the Supreme Court went to great effort to craft in order to stem the tide of unwarranted lawsuits."); *Madray v. Publix Supermarkets, Inc.*, 30 F. Supp. 2d 1371, 1375 (S.D. Fla. 1998)("[t]o permit an employee to disregard a policy of which she was admittedly aware based on generalized fears would require an employer to be automatically liable for harassment committed by a supervisor. This is a result the Supreme Court expressly sought to avoid"); *Jones v. USA Petroleum Corp.*, 20 F. Supp. 2d 1379, 1386 (S.D. Ga. 1998) *aff'd.* 208 F.3d 1290 (11th Cir. 2000)(conclusory allegations that plaintiffs felt they would get into trouble if they reported supervisor's harassing behavior is insufficient to withstand a motion for summary judgment).

A review of Parker's deposition testimony reveals that his statements concerning being afraid of Cicinato are, at most, conclusory in nature as demonstrated by a brief excerpt.

Q.     (Ms. Singer) What is the reason you didn't call Peter Hulbert?

A.     (Mr. Parker) He was talking like, you know – the way Ed talked, he the guy that kind of scared you, and you know, like – he tell you, "I don't care who you call," the corporate office or whatever, that he runs this – this is his hotel, like the Holiday Inn is his. (Parker Depo. pp. 102-3)

       ...

23

Q.    Now I'm just trying to understand when you heard this bad language what is the reason that you didn't call Peter Hulbert back?

A.    He was scaring me, threat to my job. Maybe I ought to call – I don't – it was a threat to my job. I mean, I got put off the schedule, you know, anything could have happened. Just, you know, I didn't take that chance calling back no more.

Q.    Well, the last time you had called, one of the times that you had called, he had put you back on the schedule.

A.    Yes ma'am. (Parker Depo. pp. 103-4).

This testimony suggests only that Parker's alleged fear was based on his generalized sense that (1) Cicinato was the kind of person who scared him and (2) he might lose his job. First, such generalized and nonspecific assertion that he was afraid of Cicinato is insufficient to create a genuine issue of fact that Parker would be subjected to repercussions had he complained to the central office. Moreover, Parker's fear of losing his job is at best, questionable, in light of the fact that when he called Hulbert earlier, he was reinstated to his position.

Because Shaner has satisfied the second prong of the *Faragher* affirmative defense, summary judgment in favor of Shaner on Parker's hostile environment claims is appropriate.

### b.    Adrian Stephenson.

As for Stephenson, Shaner points out that she admits that she never complained to management officials or called the corporate office to complain about race discrimination. (Stephenson Depo. pp. 156-158). However, the plaintiff vaguely responds that either each plaintiff called the home office to complain about Cicinato, or if they failed to, it was

24

because they knew of the lack of success of those who did.[6] Additionally, she responds that she was scared to call the corporate office in the event she was not believed, and that many employees complained to Zandi. Lastly, she points to the testimony of Shaner's corporate representative in which he stated that he knew of no evidence that would contradict the testimony of each plaintiff that they called the home office to complain about race discrimination at the hotel.

Although the plaintiff admitted in her deposition that she never called the corporate office to complain about race discrimination or the use of racial slurs, she argues in her responsive submission that her complaint to the office after Cicinato's statement concerning his mafia family and job security could reasonably be inferred to constitute a complaint of race discrimination.[7] A more reasonable inference to be drawn from the report of the so-called "mafia" statement is not that it evidenced Cicinato's prejudice but rather his belief that he was safe from any threat of termination. Moreover, it is difficult to see how Shaner would be put on notice of a hostile work environment towards blacks when Cicinato's comment is void of any racial suggestions.[8] The plaintiff's contention is also undermined by the fact that plaintiff Ronnie Parker testified that Cicinato made mafia comments to both

---

[6] Unfortunately, the plaintiffs did not apply the particular facts of their case to the law as set out in *Faragher*. Rather, they simply provided the court with the same response that was asserted in all of the plaintiffs' submissions. Nevertheless, the court thoroughly reviewed the relevant evidence concerning Stephenson, including her deposition, and made its decision accordingly.

[7] A review of the evidence indicates that Stephenson also called the corporate office to complain about Cicinato's behavior towards all employees after the spoiled milk incident. Because the call concerned the treatment directed at both black and white employees, it cannot be inferred that the call would somehow notify Shaner of a racially hostile environment at the hotel.

[8] The court notes that after Cicinato's statement, Stephenson called the corporate office. Accordingly, she does not assert that because of the statement she was afraid to call the office or that she felt like making a call would be useless.

black and white people. (Parker Depo. p. 123). Accordingly, the call to complain about Cicinato's mafia-related comments does not constitute a complaint of hostile environment racial harassment.[9]

In addition, the plaintiff contends, albeit generally, that she knew other employees who made unsuccessful complaints to the corporate office. However, because the plaintiff has failed to present any significant evidence to support this allegation, the court does not recognize her conclusory argument.

Although it is not mentioned in her responsive brief, the court notes that Stephenson testified at her deposition that she did not feel that calling the corporate office would help because she had called about "other things" and, allegedly, nothing was done about it. While that reason could, in some circumstances, relieve an employee from complying with an employer's policy, for Stephenson, that is not the case.  She fails to present any evidence, beyond her mere conclusory statement, to demonstrate that her previous calls simply fell on deaf ears. Additionally, the plaintiff has never specifically complained to the corporate office about racially discriminatory conduct.  The court cannot assume that Shaner would not have treated complaints of racial discrimination more seriously than it did complaints of lesser import. Accordingly, as the plaintiff has proffered mere conclusory statements without evidentiary support, the court does not find that a genuine issue of

---

[9]This evidence elicits an observation. To be blunt, it challenges one's sense of credulity to believe that at the tail end of the Twentieth Century a hotel supervisor in Birmingham, Alabama, would seriously suggest that any threat to his rather mundane job would warrant the attention of "mafia Dons." Of course, the court, at the summary judgment stage, does not make credibility choices and has accepted this evidence as true for these limited purposes. Still, it sounds as if Mr. Cicinato may have had his tongue buried firmly next to his jaw bone when he made the statement.

material fact exists as to whether she was justified in failing to follow Shaner's notification procedures.

Furthermore, plaintiff generally alleges that she did not take advantage of the notice system because she was scared to call the corporate office. However, as previously stated, a plaintiff cannot escape summary judgment by asserting the conclusory statement that she was scared to call the corporate office in the event she was not believed. To hold otherwise would essentially impose liability upon employers for failing to combat harassment in which it was not aware. *See Fierro v. Saks Fifth Ave.,* 13 F. Supp. 2d 481, 492 (S.D. N.Y. 1998); *Madray v. Publix Super Mkts. Inc.*, 30 F. Supp. 2d 1371, 1375 (S.D. Fla. 1998); *Jones v. USA Petroleum Corp.*, 20 F. Supp. 2d 1379, 1386 (S.D. Ga. 1998). Accordingly, the plaintiff's generalized fear is not enough to excuse her non-compliance with Shaner's explicit method for notifying it of harassing behavior.

The plaintiff's two other reasons for non-compliance are conclusory statements which fail to create the requisite genuine issue of fact. Stephenson herself admitted that she did not talk to Zandi about Cicinato's racially derogatory comment directed to her after the milk incident. The only other evidence concerning Stephenson and Zandi is his testimony that the plaintiff complained to him "all the time" that Cicinato was prejudiced.[10] (Zandi Depo. p. 19). In *Madray,* the Eleventh Circuit described in some detail what constituted an employee's reasonable use of preventative or corrective opportunities. 208 F.3d at 1301-02.

_____

[10] The plaintiff has failed to provide any evidentiary citation for her contention that she complained to Zandi about Cicinato's behavior. Moreover, the court questions whether Zandi, as food and beverage director for the Holiday Inn, falls into any of the categories of acceptable persons to complain to – General Manager, Vice President of Operations, the Insurance/Benefit Department, or officer of Shaner Hotel Group.

An important factor to the court's determination that the plaintiffs failed to avail themselves of the employer's measures was the fact that their complaints to mid-level managers did not fully inform the mangers of the extent of the harassment, nor did the plaintiffs request that the mid-level managers take action to stop the supervisor's behavior. *Id.* In like manner, the only evidence presented here indicates that Stephenson's comments to Zandi failed to inform him of the extent of Cicinato's behavior. Also, there is nothing which indicates that Stephenson specifically requested that Zandi take action to stop Cicinato.

As for the testimony of Shaner's corporate representative that he knew of no evidence that would contradict the testimony of each plaintiff concerning calling the corporate office, such testimony is irrelevant to the court's determination that Stephenson never called the corporate office to complain about race discrimination.

Taken as a whole, Stephenson's failure to use Shaner's grievance procedures to report Cicinato's conduct was not reasonable under the circumstances. The court finds no basis upon which a reasonable fact-finder could conclude that Stephenson reasonably availed herself of the preventive and corrective opportunities provided by Shaner's policy. Accordingly, because the defendant has successfully interposed the *Faragher* affirmative defense, summary judgment for Shaner on Stephenson's hostile environment claims is appropriate.

28

### B.     Other Claims.

#### 1.     Ronnie Parker.

##### a.     Wrongful Termination.

In counts XVIII and XXXII of the complaint, Parker asserts that he was wrongfully terminated because of his race. Because Parker has not produced any direct evidence of discrimination, the court will apply the *McDonnell-Douglas* burden shifting framework. Under the *McDonnell Douglas* framework, a plaintiff seeking to establish a claim based on circumstantial evidence has the initial burden of establishing a prima facie case of discrimination. "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Lathem v. Department of Children and Youth Services*, 172 F.3d 786, 792 (11th Cir. 1999) (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). In order to establish a *prima facie* case, the plaintiff must introduce evidence of actions taken or decisions made by an employer "from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under the Act." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 576 (1978). The burden of production then shifts to the defendant to articulate a "legitimate nondiscriminatory reason" for the allegedly discriminatory employment action. *Lathem*, 172 F.3d at 793. "[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted." *Brown v. American Honda Motor Co., Inc.,* 939 F.2d 946, 950 (11th Cir. 1991), *cert denied*, 502 U.S. 1058 (1992) (quoting *Grigsby v. Reynolds Metal Co.*, 821 F.2d 590, 596 (11th Cir. 1987).

Once the defendant presents a legitimate nondiscriminatory reason for its action, the presumption of discrimination "drops from the case." *Texas Dep't of Community Affairs v. Burdine* 450 U.S. 248, 255 n.10 (1981). The plaintiff must then prove by a preponderance of the evidence that the reason offered by the defendant was not the true reason for the employment decision, but rather is a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. Conclusory allegations of discrimination are insufficient; rather, the plaintiff must present concrete evidence of pretext in the form of clear and specific facts. *Earley v. Champion*, 907 F.2d 1077, 1083-84 (11th Cir. 1990). A plaintiff may establish pretext directly by persuading the court that a discriminatory reason more likely motivated the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Combs v. Plantation Planters*, 106 F.3d 1519, 1528 (11th Cir. 1997); *see also Bogle v. Orange County Bd. of County Comm'rs,* 162 F.3d 653, 658 (11th Cir. 1998)(declaring that the defendant was not entitled to judgment as a matter of law if plaintiff produced "any evidence that would allow a reasonable jury to disbelieve the proffered reasons for his discharge").

If a plaintiff succeeds in meeting this burden, the disbelief of the defendant's proffered reasons, together with the *prima facie* case, is sufficient circumstantial evidence to support a finding of discrimination and to preclude summary judgment. *Combs*, 106 F.3d at 1529. Because of the difficult factual questions involved in assessing an employer's "true motivations," once the plaintiff has presented evidence raising a question about those motivations, summary judgment is ordinarily inappropriate. *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 919 (11th Cir. 1993). If evidence in the record "demonstrate[s]

30

such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's preferred legitimate reasons for its action that a legitimate factfinder could find them unworthy of credence," the final assessment of the employer's motivation must be left to the jury. *Combs,* 106 F.3d at 1538.

To establish a *prima facie* case of discrimination in discharge, Parker must show: (1) that he belongs to a protected minority; (2) that he was qualified for the position held; (3) that he was terminated; and (4) that Shaner awarded the position to someone outside the protected class and/or that he was treated differently than persons outside the protected class. *Cooper-Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 (11th Cir. 1994).

Shaner argues that Parker cannot establish the fourth element of the *prima facie* case. According to the plaintiff's deposition testimony, after he was laid off in December of 1997, less senior white servers continued to work banquets. Shaner responds that the evidence of record, including Parker's deposition, demonstrates that while less senior white workers did work banquets after the "lay-off," less senior black workers, such as "Debra" and "Henry" also worked these events. Thus, the evidence presented by Shaner indicates that not only did Shaner treat less senior employees "outside" the plaintiff's class more favorably than Parker, but it also treated less senior black employees more favorably than it treated him. Unfortunately, in his responsive submission, Parker does not address his wrongful termination claim, much less the evidence concerning other black workers continuing to work banquets.

31

The Eleventh Circuit has not squarely addressed this precise issue. However, in *Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321, 1323 (11th Cir. 1998), in affirming the district court the Eleventh Circuit stated,

> In this disciplinary discharge case, no direct evidence of discrimination was submitted at trial. No statistical evidence was presented. No evidence shows that, after Plaintiff was fired, she was replaced by a nonminority employee. No pattern-or-practice of discrimination was evidenced or attempted to be evidenced. And most important, no similarly situated, nonminority employee was identified who was treated better than Plaintiff.

*Id.* at 1324. The court stated that the plaintiff did not establish the prima facie case because one could not infer from the evidence, including evidence excluded at trial but considered on appeal, that it was *"more likely than not"* that the plaintiff's termination was based on an illegal discriminatory criterion. *Id.* at 1323; *see also Smith v. Secretary of the Navy*, 659 F.2d 1113, 1119 (D.C. Cir. 1981)(declaring that a prima facie case requires the plaintiff to make a showing that the adverse employment action, such as discipline, would not have occurred "but for" an act of discrimination).

Following the reasoning of *Jones*, the court is satisfied that Parker has not established a *prima facie* case. The evidence is that although non-minority less senior workers continued to work banquets, less senior minorities did the same. Moreover, there is no direct, statistical, or pattern and practice evidence which indicates the discipline was based on illegal discriminatory criterion. Unfortunately for Parker, what the evidence suggests is that he was treated differently than other banquet employees, black or white. As such, one can not infer that it was more likely than not that the plaintiff's discipline was

based on his race. Accordingly, there is no inference of discrimination, and Parker has not met his initial burden of establishing a *prima facie* case.

Even were the court to find that a *prima facie* case was established, the plaintiff's wrongful termination claim would fail. Shaner contends that Parker was terminated because he did not return from slack time when called in to work. Thus, the court is satisfied that the defendant has presented a legitimate nondiscriminatory reason.

Because Parker did not address the wrongful termination claim, he presents no evidence sufficient to raise a genuine issue of material fact regarding whether a discriminatory reason more likely motivated Shaner, or that the employer's proffered explanation is unworthy of credence. Moreover, after carefully and thoroughly reviewing the record, the court concludes that the plaintiff has not produced plausible evidence that would permit a jury to disbelieve Shaner's stated legitimate nondiscriminatory reasons for terminating the plaintiff. Accordingly, the defendant is entitled to summary judgment as to the plaintiff's termination claim.

<b>b.      Disparate Treatment.</b>

Parker also charges that he was given less desirable duties, less pay, and less favorable shifts than white employees. Unfortunately, like his discharge claims, the plaintiff does not address these claims in his responsive submission.

Despite the plaintiff's failure to address his various disparate treatment claims, the court has independently reviewed the evidence of record. Upon such review, the court finds no direct evidence of disparate treatment. Accordingly, Parker's disparate treatment claims will be examined pursuant to the *McDonnell-Douglas* framework set out above.

33

As for any claim related to pay, the court finds no significant evidence which indicates a disparity in pay. In particular, the court does not find an appropriate comparator to Parker. Thus, the evidence, viewed in a light most favorable to the plaintiff, does not indicate that Shaner treated Parker differently from persons outside the protected class with respect to pay. Accordingly, the plaintiff has failed to establish the requisite *prima facie* case.

The only other relevant incident upon which a disparate treatment claim could be grounded concerns one occasion in which Tester and Waters disciplined Parker by ordering him to leave work. However, after carefully reviewing the evidence of record, the court finds no significant evidence in which such incident could be found to be discriminatory. Foremost, for purposes of establishing a *prima facie* case, the court does not find a white employee who engaged in substantially similar conduct who was similarly disciplined. Moreover, Shaner has proffered legitimate nondiscriminatory reasons for its action, such as, that Parker was insubordinate and displayed threatening behavior towards Tester and Waters. In response, the plaintiff has failed to present, and the court finds no evidence, which indicates that these reasons are pretextual. Accordingly, the defendant's motion for summary judgment as to the disparate treatment claims is due to be granted.

### c.    Retaliation.

Parker asserts that he was improperly terminated in retaliation for complaining to Shaner officials about race discrimination by Cicinato and unequal work schedules, and for filing a charge of discrimination with the EEOC. Regardless of whether a retaliation claim is brought pursuant to Title VII or § 1981, it is well established that in order to make out a

*prima facie* case, the plaintiff must demonstrate: (1) that he was engaged in statutorily protected expression, (2) the defendant took an adverse employment action against him, and (3) a causal link between the protected conduct and the adverse action. *See e.g. Raney v. Vinson Guard Service, Inc.,* 120 F.3d 1192, 1196 (11th Cir. 1997); *Crumpton v. St. Vincent's Hospital*, 963 F. Supp. 1104, 1118 (N.D. Ala. 1997). Shaner may rebut the *prima facie* case by articulating a legitimate nondiscriminatory reason for the employment action with credible evidence. *Holifield* 115 F.3d at 1567. If the employer offers legitimate reasons for the employment action, the plaintiff must then demonstrate that the employer's proffered explanation is a pretext for retaliation. *Id.*

Parker claims that on two occasions he engaged in statutorily protected conduct: first, in September of 1997 he complained to Hulbert about being removed from the schedule and second, in January of 1998, he filed a charge of discrimination with the EEOC.[11] The plaintiff appears to allege that he was laid off on December 20, 1997, and terminated sometime thereafter. In contrast, the defendant contends that Parker was terminated on January 30, 1998, for not returning to work after being called back after a period of "slack time." Unfortunately, the plaintiff's responsive submission does little to address these differences.

Parker's complaint to Hulbert in September of 1997 resulted from his removal from the work schedule after he missed a banquet function. The plaintiff contends that he missed

---

[11] In his responsive brief, the plaintiff asserts that the charge was made in December of 1997. However, this assertion is not supported by the cited material therein, nor is it consistent with Parker's deposition testimony in which he testified that he did not file his first charge of discrimination until the "first of the year." (Parker Depo. pp. 135-36).

the banquet because the "saleslady" put up the "function sheet" too late in the day for him to see it. The next day, Parker was called into Tester's office to explain his absence. According to Parker, after he explained the situation concerning the function sheet, Tester and Waters got upset and told him that he could leave for the day. After leaving, he called the hotel office to ask about his future work schedule. However, Parker claims that he was informed that he had been taken off the schedule entirely. Thereafter, he states that he called Hulbert at the Shaner corporate office. Hulbert responded by setting up the meeting where the decision was made to return Parker to the work schedule.

An employee engages in statutorily protected activity when he or she protests an employer's conduct which is actually lawful, so long as he or she demonstrates a "good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little v. United Technologies, Carrier Transicold Division,* 103 F.3d 956, 960 (11th Cir. 1997). The plaintiff's burden has both an objective and a subjective component. "A plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented." *Id.*

The Eleventh Circuit considered the parameters of statutorily protected expression in *Coutu v. Martin County Bd. of County Commissioners,* 47 F.3d 1068 (11th Cir. 1995). In *Coutu*, the plaintiff asserted that the defendant retaliated against her because she filed a grievance against Robert Oldland ("Oldland"), the County Administrator. However, upon examination, the court determined that Coutu failed to prove that the grievance constituted statutorily protected activity. First, the court noted that although the grievance contained a

36

conclusory allegation of discrimination, at the grievance hearing, the plaintiff waived this allegation and offered no further proof of unlawful discrimination. *Id.* at 1074. Rather, she simply testified that she worked hard and deserved a better evaluation than Oldland had given her. The court further concluded that "unfair treatment, absent discrimination based on race, sex, or national origin, is not an unlawful employment practice under Title VII. Accordingly, Coutu's grievance against Oldland did not constitute statutorily protected activity." *Id.*

The present situation is analogous to *Coutu*. In his responsive submission, the plaintiff has failed to demonstrate that his complaint to Hulbert constituted statutorily protected activity. Although he makes a conclusory allegation that he called Hulbert to complain about "discrimination," the cited deposition testimony does not support his claim. Rather, a review of the relevant testimony reveals that Parker describes the events as a "misunderstanding" and simply states he told Hulbert that he thought he was treated "unfairly" by Tester and Waters. Thus, similar to Ms. Coutu, Parker makes a conclusory allegation of discrimination, but did not support the claim with his testimony and failed to offer proof that the schedule decision was discriminatory in nature. Also, like Ms. Coutu, the plaintiff described his treatment as being "unfair." As plainly stated by the Eleventh Circuit, unfair treatment, absent evidence of discrimination based on race, does not qualify as an unlawful employment practice under Title VII or § 1981. Accordingly, the defendant is entitled to summary judgment as to all retaliation claims stemming from the plaintiff's phone calls to Hulbert.

Consequently, the only evidence of statutorily protected activity concerns filings or statements made to the EEOC. Unfortunately, the record is unclear as to the exact dates of such filing(s). The plaintiff states in his responsive submission that he made a statement in December of 1997. However, there is no evidence from which a jury could find that Shaner was aware of the statement. Moreover, the plaintiff also testified that he did not file his first charge of discrimination until the "first of the year." (Parker Depo. pp. 135-36). Parker's deposition testimony reveals that an amended charge was filed on January 16, 1998, and another charge was filed on February 2, 1998. Giving the plaintiff every reasonable inference, the court assumes that a charge was filed sometime after he was laid off, but before he was terminated on January 30, 1998.

Thus, the evidence is sufficient to justify a jury in finding that Parker engaged in protected conduct and that he suffered an adverse employment action. Accordingly, the first two elements of the *prima facie* case of retaliation have been met.

However, the plaintiff has failed to present evidence to suggest a causal connection between the EEOC charge and his termination. The plaintiff's burden here is not an onerous one. He must merely produce evidence sufficient to justify a jury in finding that his protected conduct and the adverse employment action were not entirely unrelated. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993)(The plaintiff must offer some evidence that her protected conduct and the adverse employment action were not "wholly" unrelated.)

Even had the plaintiff carried his burden on the retaliation, Shaner is entitled to summary judgment because it has articulated a legitimate nondiscriminatory reason for the

38

decision to terminate Parker's employment. The defendant asserts that it terminated Parker's employment because he failed to appear for work after he was called for a banquet function on January 21, 1998. In support of its defense, the defendant proffers the plaintiff's personnel file which includes a written warning notice dated January 21, 1998, signed by Food and Beverage Director Terry McDowell, as well as a separation notice dated January 30, 1998, also signed by McDowell, stating that Parker was terminated because he "did not return from slack time when called in to work."

After carefully and thoroughly reviewing the record, the court concludes that the plaintiff has not produced plausible evidence that would permit a jury to disbelieve Shaner's stated legitimate nondiscriminatory reasons for terminating the plaintiff. Accordingly, the defendant is entitled to summary judgment as to the plaintiff's retaliation claim.

Finally, there is no evidence that McDowell, the Shaner employee who made the decision to terminate Parker, was aware of the plaintiff's EEOC charge. This is further reason for granting summary judgment in favor of the defendant on the retaliation claims. *See Clover v. Total Systems Services*, 176 F.3d 1346, 1354 (11th Cir. 1999).

## 2. Adrian Stephenson.

### a. Equal Pay Act.

In her responsive submission the plaintiff has expressly abandoned her Equal Pay Act Claim. Accordingly, the defendant is entitled to summary judgment as to this claim.

### b. Retaliation.

Stephenson asserts in her complaint that "after (she) complained to the corporate office about Mr. Cicinato's treatment, which included his usage of racial slurs and his

39

threatening behavior, Mr. Cicinato boasted about being in the Mafia and having connections. Plaintiff Stephenson took this statement as a threat for her complaints of discrimination" in violation of 42 U.S.C. § 1981.[12]

The court finds that Stephenson's retaliation claims are due to be dismissed because she has failed to establish a *prima facie* case. First, she admits that she never complained to the corporate office concerning race discrimination. *See Coutu* 47 F.3d at 1073 (filing a grievance did not amount to statutorily protected activity where, during the grievance hearing the plaintiff made no allegation and offered no proof of race discrimination). Second, Cicinato's vague boasts about his family and job security do not constitute an adverse action against the plaintiff. Lastly, to the extent she tries to assert a retaliation claim based upon her transfer, the court finds that a transfer that never happened cannot be considered a retaliatory action. Accordingly, the court finds that plaintiff has failed to satisfy her burden, and that summary judgment on this claim is due to be granted.

### c.    Constructive Discharge.

The plaintiff also brings a constructive discharge claim under 42 U.S.C. § 1981. "When an employee involuntarily resigns in order to escape intolerable and illegal employment requirements to which he or she is subjected because of race, color, religion, sex or national origin, the employer has committed a constructive discharge in violation of Title VII." *Henson v. City of Dundee*, 682 F.2d 897, 907 (11th Cir. 1982) *quoted in Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir. 1993). Additionally, a plaintiff must also demonstrate that

---

[12] This statement is directly contradictory to Stephenson's deposition testimony wherein she admitted she never called the corporate office to complain of race discrimination. (Stephenson Depo. pp. 156-160).

her working conditions were so intolerable that a reasonable person in her position would be compelled to resign. *Morgan*, 6 F.3d at 755. There must be a "high degree of deterioration in working conditions, approaching the level of intolerable." *Hill v. Winn-Dixie*, 934 F.2d 1518, 1527 (11th Cir. 1991).

According to Stephenson, after Cicinato referred to her as a "stupid nigger" she felt so much pain that she never could return to work at the hotel. However, the defendant presents a record of a verbal warning and Zandi's testimony to suggest that the plaintiff was actually terminated for lack of ability, failure to abide by Shaner rules, and failure to fulfill the requirements of her job. (Defendants Ex. 55). The plaintiff maintains that she never saw the record of verbal warning, and that the information contained therein is incorrect. Furthermore, she states that while Shaner contends that Zandi fired her, Zandi testified that Cicinato was responsible for her termination. Lastly, the court notes that the record of verbal warning which states the reasons for terminating the plaintiff was not signed by her. Accordingly, the court finds a genuine issue of material fact exists as to whether the plaintiff quit or was terminated.

Nevertheless, if Ms. Stephenson did in fact quit, the defendant would still be entitled to summary judgment on the constructive discharge claim. Generally, there will be no constructive discharge when the employer is denied a reasonable opportunity to remedy the situation. *Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 754 (11th Cir. 1996). Thus, an employer cannot be expected to remedy a racial harassment situation if it has no knowledge of it.

41

While there is a genuine issue concerning whether Stephenson quit or was terminated, it is undisputed that she did not give Shaner notice of the alleged discriminatory behavior on the part of Cicinato. Because it did not have notice of the situation, Shaner did not have an opportunity to remedy the alleged intolerable conditions. Moreover, even if Shaner had notice, the plaintiff did not give the defendant a reasonable opportunity to correct the situation. The plaintiff herself contends that she quit the day after Cicinato directed a racial slur toward her. This situation is similar to the one addressed by the Eleventh Circuit in *Garner v. Wal-Mart*, 807 F.2d 1536 (11th Cir. 1987). In *Garner*, the court denied a constructive discharge claim where the employee, who quit one day after complaining of an adverse reassignment which she felt was in retaliation for an EEOC filing, failed to give the employer sufficient time to address the matter. Accordingly, as this situation is quite similar to *Garner*, the court finds that by quitting a day after the racially discriminatory statement was allegedly made, the plaintiff did not allow the defendant time to remedy the situation and summary judgment in favor of the defendant is appropriate.

### 3. Johnny Lavender.

#### a. Wrongful Termination.

Lavender also asserts that he was wrongfully terminated in violation of 42 U.S.C. § 1981 and Title VII. As with Parker, Lavender has not presented direct evidence of discrimination. Accordingly, the court will again apply the *McDonnell Douglas* framework. The defendant initially contends that Lavender is unable to satisfy the fourth element of the *prima facie* case – that similarly situated white employees were not terminated after participating in similar activity.

In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). Evidence relating to the treatment of other employees who are not similarly situated does not prove discrimination and may properly be excluded from consideration. *See Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306 (11th Cir.), *modified in other respects,* 151 F.3d 1321 (1998). The Eleventh Circuit has indicated that a fairly tight fit is required between the allegedly wrongful acts of the plaintiff and those of the comparators. "[I]t is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Medical Center*, 137 F.3d at 1311. The court has gone so far as to suggest that the offenses committed by the comparators must be "'nearly identical.'" *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984).

According to Lavender, Tim Hancock, a white hotel employee, was caught on the premises having a party in a hotel room but was not fired. However, Tim Hancock's personnel file is void of any reference to the alleged incident and General Manager Voelkze states that no such incident ever occurred. (Def. Ex. #23). Although Lavender did not testify about this incident, he points to the testimony of plaintiff Prince to support his allegation. According to Prince, Tim Hancock and some friends were caught drinking in a room by hotel security and Wil Tester. (Prince Depo. pp. 260-261). Prince states that Tim Hancock

was not fired because of his father, Marvin Hancock.[13] (Prince Depo. pp. 260-261).

Prince and Jenkins did not testify as to their personal knowledge of the incident, and Glass admitted that he learned about it because "everyone" in the maintenance shop was talking about it. The only reasonable inference to be drawn is that all of the plaintiffs who testified about the Hancock incident learned of it from other persons. For that reason, their effort to prove the truthfulness of the incident is hearsay. They do not direct the court to any hearsay exception that would apply to allow them to present testimony gained second hand. Moreover, they can point to no individual who could offer evidence of that incident based on personal knowledge. Inadmissible evidence can no more be used to oppose summary judgment than it can be used to prove a claim at trial.

Plaintiff also points to Wil Tester as a white employee who received preferential treatment. According to Randy Prince, he and Brian Jenkins found drugs in Tester's room and desk. (Prince Depo. p. 332). Prince alleges that although Chief Engineer Ron Meade was aware of the drugs in Tester's room, Tester was never disciplined.[14] Neither Jenkins nor Meade testified concerning either incident. Prince also made a somewhat vague and conclusory remark that Tester drank on the job.

When deciding whether employees are "similarly situated," an important aspect is the nature of the offenses committed. *See Jones*, 137 F.3d at 1311. If the comparable conduct includes too many different variables, then, for similarly situated purposes, their use as

---

[13] While the plaintiff points only to Prince's testimony, the court notes that plaintiffs Jenkins and Glass also testified about the Tim Hancock incident. (Jenkins Depo. pp. 121-122); (Glass Depo. p. 177).

[14] Prince also testified that Ron Meade did not have the power to discipline Tester.

comparators will likely be precluded. *Id.* at 1312. After careful consideration, the court is satisfied that there are too many differences between the drug possession charge against Tester and the charge against Lavender that he had made pass keys to hotel facilities without authorization and was on the premises after hours. In particular, the defendant was entitled to interpret its own work rules as it deems appropriate so long as it does so in a nondiscriminatory fashion. *Id.*

The only other evidence of a similarly situated white employee who was not terminated for being on hotel property after-hours is the testimony concerning Tim Hancock. Because such testimony has been deemed inadmissible, the court finds that the plaintiff has failed to establish a question of fact as to a requisite element of the *prima facie* case.[15] Accordingly, summary judgment in favor of the defendant as to Lavender's retaliation claim will be granted.

Even if a *prima facie* case is established, the defendant has presented legitimate non-discriminatory reasons for Lavender's termination which he has failed to rebut. According to Shaner, Lavender's off duty intrusion violated several Shaner rules. In addition, Lavender had previously been disciplined for allegedly making unauthorized pass keys. Because the defendant must only proffer nondiscriminatory reasons, the court finds that Shaner has satisfied its burden and the presumption of discrimination drops from the case.

---

[15] Even if the court considered the Tim Hancock incident, the court finds that he was not similarly situated to Lavender. The evidence demonstrates that Lavender had two mishaps before he was terminated. First, he was caught and disciplined for allegedly making unlawful pass keys. Then, in a separate incident weeks later, he was caught on hotel property after hours. In contrast, the record indicates that the Tim Hancock incident was his first mishap. Accordingly, at the time of his termination, Lavender, was not similarly situated in all relevant respects to Tim Hancock. It is noteworthy that upon being caught sleeping on the job, which would constitute his second violation of Shaner rules, Tim Hancock, like Lavender, was terminated.

The burden shifts back to the plaintiff to show that the asserted reason is merely a pretext for discrimination.

Lavender attempts to prove pretext by asserting that a genuine issue of fact exists as to his whereabouts on the night of the incident. According to the plaintiff, on the evening in question, he was staying at the Bama Hotel in Birmingham and had no reason to be at the Holiday Inn.

A thorough review of the evidence taken in the light most favorable to the plaintiff fails to establish that a jury could find by a preponderance of the evidence that the plaintiff has established that Shaner's articulated reason for his discharge was a pretext for discrimination. Foremost, the plaintiff has not produced any evidence to rebut the defendant's contentions regarding the unauthorized pass key incident. As for allegations concerning the Bama Hotel, the plaintiff appears to rely solely on his testimony.[16] In other words, he is simply alleging he was not there, without presenting anything further. In contrast, the defendant presents an incident report signed by T.W. McCluskey of Wackenhut, which states that he saw Lavender and a female enter the building at 2:30 a.m. on January 3, 1998. Moreover, Lavender testified that McCluskey knew him and could identify him. There is absolutely nothing in the record that indicates that McCluskey and/or Shaner fabricated or falsified the report. Finally, "[F]ederal courts do not sit to review the accuracy of the employer's fact findings or of the employer's decision to terminate a plaintiff's employment." *Jones*, 151 F.3d at 1324, fn. 24.

---

[16] While Lavender refers to "receipts" from the Bama Hotel, he has yet to introduce them as evidence.

After thoroughly reviewing the parties' submissions, the court concludes that a triable issue has not been created as to whether the plaintiff has demonstrated a discriminatory reason more likely motivated the employer, *Combs*, 106 F.3d at 1528. Accordingly, the defendants motion for summary judgment as to Lavender's termination claim is granted.[17]

### b.    Retaliation.

Lavender, like Parker, asserts that he was terminated in retaliation for complaining to Shaner officials about race discrimination by Cicinato and unequal work schedules, and for filing a charge of discrimination with the EEOC in violation of 42 U.S.C. § 1981 and Title VII. As articulated by the court in the wrongful termination section of the opinion, Shaner presented a legitimate nondiscriminatory reason for the termination and in response, Lavender has failed to demonstrate that the explanation was merely a pretext for discrimination, or retaliation. Accordingly, there being no question of fact for a jury to decide, the court grants the defendant's motion for summary judgment as to the plaintiff's retaliation claim.

## V.    Conclusion.

The court will enter an appropriate order granting Shaner's motion for summary judgment and dismissing with prejudice Parker, Lavender, and Stephenson's claims, in conformity with this memorandum of opinion.

---

[17] Because the court finds that the defendant is entitled to summary judgment based on the original arguments concerning wrongful termination, it will not examine the defendant's supplemental motion filed in January of 2000. However, nothing in this opinion should be read to negate or invalidate Shaner's compelling arguments made therein.

47

Done, this 27th of July, 2000.

Edwin Nelson
United States District Judge